# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00760-CR

**James Arthur Brown, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT
### NO. D-1-DC-13-300630, HONORABLE DAVID CRAIN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

The events forming the basis for this appeal originate from proceedings in which James Arthur Brown's parental rights to his daughter L.B. were terminated. Subsequent to the termination ruling, Brown was charged with three counts of retaliation for allegedly threatening the following three individuals who were involved in the proceeding: (1) the assistant district attorney who represented Child Protective Services during the hearing, Jannice Joseph; (2) the caseworker assigned to the case, Sara Laney; and (3) L.B.'s guardian ad litem, Cynthia Dyar. *See* Tex. Penal Code § 36.06 (setting out elements of offense of retaliation and explaining that offense is third-degree felony). The indictment contained an enhancement paragraph listing prior felony offenses purportedly committed by Brown. *See id.* § 12.42(a) (authorizing enhancement of punishment for previous felony conviction). At the end of a bench trial, the district court determined that Brown was guilty of all three counts, found the enhancement paragraph to be true, and assessed

Brown's punishment at 15 years' imprisonment for each count with the punishments set to run concurrently. On appeal, Brown challenges the sufficiency of the evidence supporting his convictions, argues that the district court erred when it overruled his motion to quash the indictment, and urges that he was denied the right to effective assistance of counsel.[1] We will affirm the district court's judgments of conviction.

## DISCUSSION

**Legal Sufficiency**

In his first issue on appeal, Brown argues that the evidence supporting his convictions for retaliation is legally insufficient.[2] Under the Penal Code, an individual commits the offense of retaliation if, in relevant part, "he intentionally or knowingly harms or threatens to harm another by an unlawful act: (1) in retaliation for or on account of the service or status of another as a: (A) public servant." Tex. Penal Code § 36.06(a)(1)(A). In addition, the Code defines "public servant" as including "an officer, employee, or agent of government." *Id.* § 1.07(a)(41)(A). Moreover, the

---

[1] In addition to the brief filed by his attorney, Brown also filed a pro se brief that raises issues that are similar to the ones contained in the brief prepared by his attorney as well as some additional issues. However, given that Brown is represented by counsel, we do not address the issues raised in his pro se brief. *See Marshall v. State*, 210 S.W.3d 618, 620 n.1 (Tex. Crim. App. 2006) (explaining that defendants have no right to hybrid representation on appeal).

[2] On appeal, Brown also argues that the evidence is factually insufficient to support his conviction. However, the court of criminal appeals has clarified that the "legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense." *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010); *see Lucio v. State*, 351 S.W.3d 878, 895 (Tex. Crim. App. 2011) (explaining that "we do not review the factual sufficiency of the evidence to support a jury's finding on the elements of a criminal offense that the State is required to prove beyond a reasonable doubt").

2

indictment in this case alleged that Brown "did then and there intentionally or knowingly threaten" Joseph, Laney, and Dyar "by an unlawful act, to-wit: Assault and Aggravated Assault, in retaliation for or on account of" their "service or status . . . as [] public servant[s]."

The purpose of the retaliation statute is "'to encourage a certain class of citizens to perform vital public duties without fear of retribution.'" *Morrow v. State*, 862 S.W.2d 612, 615 (Tex. Crim. App. 1993) (quoting *Doyle v. State*, 661 S.W.2d 726, 729 (Tex. Crim. App. 1983)). To constitute retaliation, a threat does not need to be direct, *Davis v. State*, 890 S.W.2d 489, 491 (Tex. App.—Eastland 1994, no pet.), nor does the threatened harm have to be imminent, *Coward v. State*, 931 S.W.2d 386, 389 (Tex. App.—Houston [14th Dist.] 1996, no pet.). In addition, the State does not have to prove that the actor intended to carry out the threat. *See Puckett v. State*, 801 S.W.2d 188, 194 (Tex. App.—Houston [14th Dist.] 1990, pet. ref'd). Instead, "the evidence must establish the retributory element found in section 36.06(a)(1), i.e., that the unlawful act was committed in retaliation for or on account of another person's service as a public servant." *Helleson v. State*, 5 S.W.3d 393, 395 (Tex. App.—Fort Worth 1999, pet. ref'd). Moreover, "retaliatory intent can be inferred from the acts, words, and conduct of the accused." *Umstead v. State*, 440 S.W.3d 909, 916 (Tex. App.—Eastland 2014, pet. ref'd) (mem. op.).

Under a legal-sufficiency review, appellate courts view the evidence in the light most favorable to the verdict and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). When performing this review, an appellate court must bear in mind that it is the factfinder's duty to weigh the evidence, to resolve conflicts in the testimony, and to make reasonable inferences "from basic facts to ultimate facts." *Id.* Moreover, appellate courts must "determine whether the

3

necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). Furthermore, appellate courts presume that conflicting inferences were resolved in favor of the conviction and defer to that resolution. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

During the trial, the State called Dyar, Laney, and Joseph to testify regarding their recollections of the threats allegedly made against them as well as the events leading up to those threats being made. In their testimonies, they each explained that they were part of a proceeding deciding whether Brown's parental rights should be terminated. Specifically, their testimony reflected the following: (1) that Dyar worked for the Travis County Office of Child Representation and acted as the attorney ad litem for Brown's daughter, L.B., during the proceeding; (2) that Laney worked for Child Protective Services and was the caseworker assigned to the case after L.B. was removed from her parents' custody; and (3) that Joseph worked for Travis County as an assistant district attorney and was assigned to the case regarding Brown's parental rights to L.B. Moreover, all three explained that Brown allegedly threatened them shortly after his rights were terminated and that he made the threats because of their involvement in the case.

Regarding the threats, Dyar testified that during the trial, Brown "showed some anger at periods" and that when the jury was reading its verdict, Brown "stormed out" of the courtroom "before the entire verdict was read." In addition, she explained that when she, Laney, and Joseph left the courtroom, Brown "started screaming at us," that he yelled to them that he would "'get the electric chair for what I do,'" that he knew "where [they] live[d]," that his life was over, and that they were not going to get his other daughter. Moreover, Dyar related that two or three deputies moved

4

between them and Brown to shield them after he made the threats, that the deputies later escorted Brown onto the elevator and followed him out of the courthouse to make sure that he left, that one of the deputies returned and informed them that it was safe for them to leave, and that the deputies escorted them from the courthouse.

When describing the exchange, Dyar explained that although Brown never used any of their names explicitly, Brown was looking at the three of them when he was talking and that she believed that his statements were intended for them. Moreover, she stated that she found the comments to be "incredibly scar[y]." In fact, she revealed that although she interacts with aggressive people because of her job, this exchange was "the scariest thing that someone" had ever said to her. Furthermore, she described Brown as "agitated, pacing back and forth" and stated that she believed that Brown was threatening them and not just expressing grief at the loss of his parental rights.

Next, Laney testified regarding her recollections. In her testimony, Laney related that Brown got upset during the termination hearing and left the courtroom after the verdict was read. Then, she revealed that when she left the courtroom with Dyar and Joseph, she noticed that Brown seemed agitated and was "pacing back and fourth."[3] Further, she stated that Brown started

_____

[3] During the trial, two video recordings were introduced and played for the district court. The first ostensibly shows Brown leaving a courtroom shortly before a group of people leave the courtroom, and the second shows Brown moving back and forth in front of an elevator. Neither video contains any sound. On appeal, Brown contends that the contents of the videos are insufficient evidence of the alleged crimes. Given our ultimate determination that the testimony presented during the trial was sufficient to support his conviction, we need not consider whether the videos on their own would have constituted sufficient evidence. However, we do note that while the lack of sound and the angle of the cameras significantly hindered their evidentiary value, nothing in the contents of the videos is inconsistent with the alleged offenses in that they show Brown leaving the courtroom followed by courtroom deputies and a group of women.

making threats towards them, that the threats were targeted to them, and that he was looking at them when he made the threats. Regarding the threats, Laney explained that Brown was repeating phrases over and over again and that he told them that he "kn[e]w where [they] lived," would "get [them]," and "didn't care if [he] got the electric chair" or was arrested. Moreover, she testified that Brown's statements frightened her, that she was scared that Brown might actually know where she lived, and that she feared for her safety after hearing those statements. In fact, Laney communicated that she was so scared that she asked the police to send officers by to check on her "every couple of hours . . . to make sure [she] was okay." In addition to discussing the events at the courthouse, Laney expressed that prior to the trial, Brown made threatening phone calls to her. Specifically, Laney revealed that during one call Brown told her, "Take my baby, see what happens."

After Laney finished her testimony, Joseph was called to the stand. In her testimony, Joseph explained that during the termination proceeding, Brown made outbursts while she was speaking. Regarding the events that happened after trial, Joseph testified that after Brown's rights were terminated, Brown "got angry and he stormed out of court." Moreover, Joseph explained that after Brown saw her enter the hallway, he waited and did not get on the elevator. When describing Brown's demeanor, she expressed that he was very angry and was "pacing back and forth." Further, she described how Brown began to increase his volume when he noticed that she, Laney, and Dyar had entered the hallway. Next, Joseph recalled that Brown threatened her, Dyar, and Laney by repeatedly saying that he knew where they lived, that he was "going to get arrested for what [he did] when [he] c[a]me to" their homes, and that he was going to get the electric chair. When describing the incident, Joseph explained that Brown was looking right at them. In fact, she

6

stated that there was no doubt that he was looking at them and that "he was giving [her] the same look that he gave [her] throughout the entire trial." In her testimony, Joseph explained that Brown's statements made her "very concerned for [her] safety."[4]

Once Joseph finished her testimony, the State rested. Subsequently, Brown called to the stand three deputies who were assigned to the courtroom where the termination proceedings were held. First, Melissa Slone testified that when Brown first left the courtroom, he seemed upset but quiet. Further, Slone recalled that when Dyar, Laney, and Joseph entered the hallway, his demeanor became "elevated" and that he started speaking loudly. When describing Brown's statements, she recalled that he said that he could not "live without [his] kids" and that he knew "where [they] work[ed]." Although Slone testified that Brown was speaking loud enough for everyone in the hallway to hear, she assumed that he was talking to his mother who was standing with him in the hallway, but Slone also characterized the statement about where the women worked as a threat. Moreover, Slone recalled that Brown repeatedly pressed the elevator button and that he got on the first elevator that appeared. Slone also testified that although she was initially concerned about the safety of the three women, she felt that they were safe once he left the building.

Second, Porsche Arnold stated that although she heard Brown make statements in the hallway, including that he did not "care if [he] went to jail," she did not believe that he needed to be arrested because he made those statements when he was grieving the loss of his parental rights. In addition, Arnold explained that she could not tell who Brown was talking to when he made those

---

[4] In her testimony, Joseph also explained that she observed Brown writing down the personal information of L.B.'s foster mother when she testified. Moreover, Joseph recalled that this observation was troubling given that Brown had made threatening statements before the trial started.

7

statements, that he was looking at everyone in the hallway when he was talking, and that he got on the first elevator that arrived.

Third, Christopher Duncan testified that he heard Brown say that he was "not afraid of dying" and that he was not afraid of the electric chair. When describing these statements, Duncan stated that he felt that Brown was angry and upset but that he did not "see a threat."

After the three deputies finished their testimony, Brown testified on his own behalf regarding the incident and explained that after his parental rights were terminated, he talked with his mother in the hallway about filing a lawsuit. Moreover, he explained that he never said that he wanted to harm anyone and that he only mentioned being sent to the electric chair in reference to the civil suit that he might file. Furthermore, he expressed that he was distraught over the outcome of the proceeding, that he was speaking loudly with his mother, that he repeatedly pushed the elevator button because he wanted to get away from the three women, and that he left as soon as the elevator appeared. Finally, Brown admitted that he realized that Dyar, Laney, and Joseph were all public servants and that he was angry at each of them for their roles in terminating his parental rights.

When challenging the sufficiency of the evidence, Brown highlights the testimony by the deputies, particularly the portion indicating that they did not believe that Brown should have been arrested or that a threat had been made. Further, Brown points to the testimony demonstrating that he was devastated over the loss of his children and urges that any statements that he made stemmed from that grief. However, in light of all of the evidence summarized above as well as the reasonable inferences that the factfinder could have made from that evidence and given our standard of review for legal-sufficiency challenges, we conclude that the evidence is legally sufficient to support

8

Brown's conviction for retaliation as alleged in the indictment. *See* Tex. Penal Code § 36.06(a)(1)(A); *see also Davis*, 890 S.W.2d at 491 (concluding that statements made to caseworker from Child Protective Services during meeting regarding potentially terminating parent's rights were sufficient to establish retaliation). Accordingly, we overrule Brown's first issue on appeal.

**Motion to Quash**

In his second issue on appeal, Brown contends that the district court erred when it overruled his motion to quash his indictment. In his brief, Brown urges that the indictment is "fundamentally defective and insufficient to provide him notice of the offense charged" because the indictment does not specify the means by which he threatened to commit assault or aggravated assault.

Immediately after the district court determined that Brown was guilty of all three counts, Brown acting pro se asked the district court, "can I motion to quash the indictment? Because the indictment, it fails to prove the third element of harm in all three counts." After Brown finished speaking, the district court stated that it "believe[d] [his] motion is not timely after the trial has occurred," but the topic was not further discussed.

Because Brown was represented by counsel when he made his request, the district court had no duty to rule on the request. *See Robinson v. State*, 240 S.W.3d 919, 922 (Tex. Crim. App. 2007) (explaining that trial court has no duty to rule on pro se motions where defendant is represented by counsel because criminal defendants are not entitled to hybrid representation). However, a trial court has the discretion to authorize hybrid representation, *Figueroa v. State*, 250 S.W.3d 490, 515 (Tex. App.—Austin 2008, pet. ref'd), and if a trial court elects to rule on a

9

pro se motion even though the defendant is represented by counsel, those rulings may be reviewed on appeal, *Robinson*, 240 S.W.3d at 922.

From the record presented on appeal, as summarized in relevant part above, it is not entirely clear that Brown actually moved to quash the indictment or that, if he did, the district court actually ruled on that request. Even assuming that the request was made and that the district court made a ruling, the ruling would not be subject to review by this Court. Brown's request was made orally, but motions to quash an indictment must be made in writing. *See* Tex. Code Crim. Proc. art. 27.10. Accordingly, "[a]n oral motion to quash or dismiss an indictment preserves nothing for review." *Owens v. State*, 437 S.W.3d 584, 586 (Tex. App.—Texarkana 2014, pet. granted).

Moreover, even assuming that the district court made a ruling on the request and that the request was made in a manner that would subject the ruling to appellate review, we would be unable to conclude that the district court erred by denying the request because it was not made until after the trial court determined that Brown was guilty. Under article 1.14 of the Code of Criminal Procedure, a defendant waives any right to object to a defect in an indictment if he does not object to the defect "before the date on which the trial on the merits commences." Tex. Code Crim. Proc. art. 1.14; *see Ortiz v. State*, No. 08-09-00148-CR, 2011 Tex. App. LEXIS 197, at *5 (Tex. App.—El Paso Jan. 12, 2011, pet. ref'd) (not designated for publication) (concluding that defendant's oral objection to quash filed on day of trial was not timely). Accordingly, a defendant may not complain about defects in an indictment that were not made before trial "[s]o long as the instrument presented to the trial court meets the constitutional requirements of a charging instrument." *Castro v. State*, 970 S.W.2d 699, 700 (Tex. App.—Corpus Christi 1998, pet. ref'd).

An indictment meets the constitutional requirements if it alleges that a person committed an offense over which the trial court has jurisdiction and if it contains allegations that "are clear enough that one can identify the offense alleged." *See Teal v. State*, 230 S.W.3d 172, 180-82 (Tex. Crim. App. 2007).

The indictment at issue in this case specified that Brown was the person being charged and generally tracked the language of the applicable statute by alleging that Brown was being charged with intentionally or knowingly threatening Dyar, Laney, and Joseph with the unlawful acts of assault and aggravated assault in retaliation for their service or status as public servants. *See* Tex. Penal Code § 36.06; *see also State v. Mays*, 967 S.W.2d 404, 406 (Tex. Crim. App. 1998) (providing that, in general, "an indictment tracking the language of a statute will satisfy constitutional and statutory requirements").

For these reasons, we cannot conclude that district court erred by denying Brown's motion to quash. *See Smith v. State*, 309 S.W.3d 10, 13-14 (Tex. Crim. App. 2010) (explaining that appellate courts review trial court's ruling on motion to quash indictment de novo). Accordingly, we overrule Brown's second issue on appeal.[5]

---

[5] In this issue, Brown also refers to two pro se motions to quash that he filed before the trial began and that were not ruled on by the district court. However, as explained above, Brown was represented by counsel and was not entitled to hybrid representation. *See Robinson v. State*, 240 S.W.3d 919, 922 (Tex. Crim. App. 2007). Accordingly, the trial court had no duty to rule on the motions, and a district court's "decision *not* to rule on a *pro se* motion in this situation [is not] subject to review." *Id.*; *see Figueroa v. State*, 250 S.W.3d 490, 515 (Tex. App.—Austin 2008, pet. ref'd) (explaining that trial court is not obligated to consider pro se pretrial motions that were filed when accused was represented by counsel). Alternatively, given that the record does not demonstrate that Brown ever obtained a ruling from the district court on the motions or that the district court expressly refused to rule on the motions, Brown has failed to preserve any error regarding the two pro se motions filed before the trial. *See* Tex. R. App. P. 33.1(a) (providing that to preserve issue for appeal, record must show that complaint was made to trial court by timely motion and that trial court ruled on motion or refused to rule on motion); *Cortez v. State*, No. 05-13-01140-CR,

**Effectiveness of Counsel**

In his third issue on appeal, Brown contends that he was denied effective assistance of counsel. When presenting this claim, Brown urges that he was denied effective assistance because his attorney "did not file any pretrial motions," did not call his mother to the stand to testify regarding what she observed and heard in the hallway, and "did not subpoena the individual responsible for generating the video[s] entered into evidence at trial" even though Brown believed that the videos had been altered to portray him more negatively. In addition, Brown insists that he was denied effective assistance of counsel during a "critical stage" of the proceeding. Specifically, he argues that he was denied effective assistance of counsel during the 30 days in which a defendant has to file a motion for new trial. *See* Tex. R. App. P. 21.4(a) (setting out deadline for filing motion for new trial); *see also Cooks v. State*, 240 S.W.3d 906, 911 (Tex. Crim. App. 2007) (explaining that "the time for filing a motion for new trial is a critical stage of the proceedings" and "that a defendant has a constitutional right to counsel during that period").

To succeed on an ineffectiveness claim, the defendant must overcome the strong presumption that his trial "counsel's conduct falls within the wide range of reasonable professional assistance" and must show that the attorney's "representation fell below an objective standard of reasonableness . . . under prevailing professional norms" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 689, 694 (1984). Evaluations of effectiveness are

---

2014 Tex. App. LEXIS 6094, at *2-3 (Tex. App.—Dallas June 4, 2014, no pet.) (mem. op., not designated for publication) (concluding that appellant did not preserve issue regarding his pro se motion to quash because he never obtained ruling from trial court after filing motion).

based on the totality of the representation. *Frangias v. State*, 392 S.W.3d 642, 653 (Tex. Crim. App. 2013); *see also Davis v. State*, 413 S.W.3d 816, 837 (Tex. App.—Austin 2013, pet. ref'd) (providing that assessment should consider cumulative effect of counsel's deficiencies). Furthermore, even though a defendant is not entitled to representation that is error free, a single error can render the representation ineffective if it "was egregious and had a seriously deleterious impact on the balance of the representation." *Frangias*, 392 S.W.3d at 653.

In general, direct appeals do not provide a useful vehicle for presenting ineffectiveness claims because the record for that type of claim is usually undeveloped. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). "This is true with regard to the question of deficient performance . . . where counsel's reasons for failing to do something do not appear in the record." *Id.* (stating that "counsel's conduct is reviewed with great deference, without the distorting effects of hindsight"). In addition, before their representation is deemed ineffective, trial attorneys should be afforded the opportunity to explain their actions. *Id.* If that opportunity has not been provided, as in this case, an appellate court should not determine that an attorney's performance was ineffective unless the conduct at issue "was so outrageous that no competent attorney would have engaged in it." *See Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001).

As set out above, most of Brown's ineffectiveness claims are based on his trial attorney's failures to act, and the record before this Court is not sufficiently developed to evaluate the alleged failures to act because "[n]either [his] counsel nor the State have been given an opportunity to respond to" the claims. *See Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012). In particular, the record does not reveal why his trial attorney did not file any pretrial motions and did

13

not call Brown's mother to the stand. Further, Brown does not identify any pretrial motions that should have been filed. In addition, although Brown contends that his mother would have provided testimony that any statements that he made in the hallway were the result of him being upset at the outcome of the termination proceeding and expressed his intent to file a lawsuit against the individuals involved in the proceeding, Brown's attorney introduced evidence regarding those topics through his questioning of the deputies and of Brown.

For these reasons, we cannot conclude that these two alleged mistakes seem so outrageous that no competent attorney would have made them.

In addition to the alleged failures described above, Brown also asserts that his attorney's representation was deficient because his attorney did not call to the stand the individual who prepared the two video recordings that were presented during the trial. As discussed earlier in Brown's first issue, the first video shows Brown leave a courtroom followed by courtroom deputies as well as another group of people, and the second video shows Brown from a different angle moving back and forth in front of an elevator. The videos did not record any sound, and they do not show Brown interacting with Dyar, Laney, Joseph, or anyone else. When Brown's attorney informed the district court that he was not calling as a witness the individual who provided the videos for trial, his attorney explained as follows:

> Mr. Brown asked that I subpoena to this hearing . . . the person who was responsible for deciding what video footage the Court got to see this morning. I've explained to Mr. Brown that I didn't think the Court would stand for that kind of subpoena, that it would be found irrelevant. So I did not.

14

Although the contents of the videos are not inconsistent with the allegations against Brown because they show Brown leaving the courtroom before the courtroom deputies and another group of people, they do not, as agreed by Brown, chronicle any criminal activity by Brown. Moreover, the events that they do capture, namely that Brown attended a court proceeding and left the courtroom before Dyar, Laney, and Joseph, were not disputed by Brown. Furthermore, although Brown contends that his attorney should have subpoenaed the individual who prepared the videos because the videos failed to fully document his movements or the location of the other individuals in the hall during the relevant time, the videos' deficiencies were discussed during the trial and are apparent when viewed.

In light of the preceding, we cannot conclude that Brown's attorney's decision to not call as a witness the person who prepared the videos falls below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 688; *see also* Tex. R. Evid. 401 (defining relevant evidence as "evidence having any tendency to make the existence of *any fact that is of consequence* to the determination of the action more probable or less probable than it would be without the evidence") (emphasis added).

Turning to his claims regarding his representation following the trial, Brown does not contend that he did not have representation during the period in time in which a motion for new trial must be filed. *See* Tex. R. App. P. 21.4(a). Rather, he insists that although his trial counsel continued to represent him, he did not want his trial counsel to represent him. In fact, he notes that before the expiration of the 30-day deadline for filing a motion for new trial, he alleged in his pro se motion for new trial and his pro se motion to appeal that his attorney had provided ineffective

15

assistance of counsel during the trial. Moreover, Brown notes that despite the fact that he did not want to be represented by his attorney, his trial counsel did not file a motion to withdraw until well after the expiration of the 30-day deadline. Finally, Brown contends that if he had been appointed new counsel, his new counsel could have alleged in a motion for new trial that he was provided ineffective assistance of counsel and challenged the sufficiency of the evidence of his convictions.

Although Brown effectively communicates that he did not want his trial attorney to continue to represent him, Brown has not overcome the strong presumption that his attorney's conduct following the trial fell within the range of reasonable professional assistance. After Brown was convicted, his attorney filed a timely motion for new trial arguing that the convictions were "contrary to the Law and the evidence" presented during trial and requesting a new trial on the ground that the competency exam ordered by the district court revealed that Brown was suffering from an antisocial personality disorder at the time of the alleged crimes and during the trial. In fact, in a letter that Brown attached to his motion to abate this appeal, the district court explained that after Brown's attorney filed a motion for new trial, the district court scheduled a hearing on the motion but that "Brown refused to enter the courtroom. Thereafter, the Motion for New Trial expired by operation of law." Moreover, the district court explained that it "fully intended to reduce the sentence significantly but Mr. Brown refused to participate."

In addition, even though it is not necessary to further address the issue, we do note that effectiveness challenges must be considered in light of "the totality of the representation" provided by the attorney. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). During the trial, Brown's attorney regularly objected to testimony from the State's witnesses and thoroughly cross-

16

examined the State's witnesses regarding their recollections of the events in question. Regarding Dyar and Laney, Brown's attorney asserted potential inconsistencies between their testimony and the video recording admitted into evidence as well as their prior written statements. Furthermore, Brown's attorney asked Dyar if Brown might have been grieving when the events occurred, and she admitted that Brown was likely grieving. During the cross-examinations of the State's witnesses, Brown's attorney regularly suggested that Brown's arrest might have been an overreaction to an unrelated high-profile case that resulted in the death of a district attorney and his wife.

Once the State closed its case, Brown's attorney moved for a directed verdict. After the district court denied the request, as described above, Brown's attorney called four witnesses to the stand, including Brown, to help establish that Brown did not intend to threaten anyone after the termination proceeding. Moreover, during his closing argument, Brown's attorney argued that no unlawful act had been proven and that the State failed to meet its burden of providing proof establishing Brown's guilt beyond a reasonable doubt.

Finally, prior to the district court imposing its punishment, Brown's attorney called Tiffany Boyden, who was the mother of Brown's children, to testify on his behalf. In her testimony, Boyden expressed that after Brown's rights were terminated, "[h]e was suicidal, not homicidal." Moreover, she expressed that Brown was devastated about losing his children.

For all of these reasons, we overrule Brown's final issue on appeal.

## CONCLUSION

Having overruled all of Brown's issues on appeal, we affirm the district court's judgments of conviction.

17

_____

David Puryear, Justice

Before Justices Puryear, Pemberton, and Bourland

Affirmed

Filed: May 12, 2015

Do Not Publish